**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROCHELLE TOMLIN, as Parent and Natural Guardian of M.B., a minor, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 25-4301 |
| ROBLOX CORPORATION, EPIC GAMES, INC., MICROSOFT CORPORATION, and JOHN DOES 1-50, | : | |
| | : | |
| Defendants. | : | |

**Perez, J.**                                                                                                   **May 20, 2026**

## MEMORANDUM

Before 1925, courts routinely declined to enforce arbitration agreements validly entered between contracting parties. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018). In response to the resulting perception that courts were "unduly hostile to arbitration," Congress adopted the Federal Arbitration Act ("FAA"), which reflects "a liberal federal policy favoring arbitration," *id.* (citation omitted), and "places arbitration agreements on equal footing with all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). The FAA "require[s] courts to respect and enforce agreements to arbitrate." *Epic Sys.*, 584 U.S. at 506. Accordingly, when interpreting a valid arbitration agreement, courts must apply a "presumption of arbitrability," giving "due regard . . . to the federal policy favoring arbitration." *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 520 (3d Cir. 2019). When parties agree to arbitrate their disputes, therefore, they strip the district courts of the authority to resolve their case. *See Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 178 (2019); *see also Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 138 (3d Cir. 2022).

These principles have caused an increase in the use of arbitration nationwide[1] and constrain this Court to compel the parties to resolve their dispute through arbitration.

Before the Court are the Motions to Compel Arbitration filed by Defendants Epic Games, Inc. ("Epic"), Roblox Corporation ("Roblox"), and Microsoft Corporation ("Microsoft"). To play Fortnite, a video game created by Epic, users must create an Epic account. Before they can play Fortnite, users must log into their Epic account and accept the Fortnite End User License Agreement ("EULA"). Likewise, to play Roblox, an online platform where users can create and play virtual games, players must create a Roblox account. When logged into their Roblox account, players may also purchase Robux—currency used for in-game purchases. To create a Roblox account, purchase Robux, or redeem gift cards for Robux, users must agree to the Roblox Terms of Use ("RTOU"). Each of these games may be played on Microsoft's Xbox platform ("Xbox"). To use Xbox, players must create both a Microsoft and an Xbox account. To set up those accounts, users must agree to the Microsoft Services Agreement ("MSA"). Periodically, Microsoft, Roblox, and Epic update their agreements and require users to accept the new terms before continuing to play. The RTOU, EULA, and MSA all contain binding arbitration provisions. The RTOU and EULA contain an additional clause delegating questions of enforceability to the arbitrator.

It is undisputed that Plaintiff M.B. has played (and continues to play) Fortnite and Roblox using two Epic accounts and one Roblox account. To create and continue using those accounts, M.B. agreed to the EULA and M.B.'s parent agreed to the RTOU. Epic and Roblox have, therefore,

---

[1] *See* Judge Craig Smith & Judge Eric V. Moyé, Outsourcing American Civil Justice: Mandatory Arbitration Clauses in Consumer and Employment Contracts, 44 Tex. Tech L. Rev. 281, 282 & n.1 (2012) (citing Marc Galanter, The Vanishing Trial: An Examination of Trials and Related Matters in Federal and State Courts, 1 J. Empirical Legal Stud. 459, 514 (2004)) ("From 1962 to 2002, the annual number of civil trials declined by more than 20%. . . . This decline was most dramatic between the years of 1985-2002, where the annual number of civil trials fell by more than 60%.").

established that contracts were formed. To the extent Plaintiff argues the arbitration clauses in the EULA and RTOU are unenforceable due to M.B.'s minority or because the agreements are unconscionable, the agreements clearly delegate those questions to the arbitrator, so this Court lacks the authority to make those determinations. Accordingly, Epic's and Roblox's motions to compel arbitration must be granted.

It is further undisputed that M.B.'s parent Rochelle Tomlin created a Microsoft and Xbox Account for M.B. to use, M.B. used that account, and in doing so, Tomlin agreed to the MSA for M.B.'s benefit. M.B. also created a second Microsoft and Xbox Account, and in doing so, M.B. independently agreed to the MSA. Unlike with Roblox and Epic, the MSA does not delegate questions of enforceability to the arbitrator. Nonetheless, although Plaintiff argues M.B. disaffirmed the MSA by filing the Complaint, M.B. continued to use the Microsoft products. Plaintiff cannot argue M.B. disaffirmed the arbitration clause while simultaneously continuing to reap the benefits of the MSA. Furthermore, to the extent Plaintiff argues M.B. cannot be bound as a third-party beneficiary to an arbitration provision under Pennsylvania law, the Court finds such a rule is preempted by the Federal Arbitration Act. Thus, the Court must also enforce the MSA's arbitration clause and grant Microsoft's Motion to Compel Arbitration.

## I. Background

Plaintiff M.B. began playing video games at the age of four. ECF No. 1 ¶ 14. Now twelve years old, M.B. has become addicted to video games, exhibiting withdrawal symptoms if they are taken away. *Id.* ¶ 226. M.B.'s academic performance has declined because of this addiction, resulting in failing grades in multiple classes. *Id.* ¶ 224. M.B. also requires special accommodations and an Individualized Educational Plan to remain at the appropriate grade level in school. *Id.*

On July 30, 2025, M.B., via their parent and natural guardian Rochelle Tomlin, brought this lawsuit, asserting the video games Roblox and Fortnite, which may be played on Microsoft's

Xbox video game platform, are addictive and, with prolonged use by children, can negatively impact brain function and cause cognitive decline and physical and emotional deficits. Plaintiff alleges that despite the well-known science showing the dangers of video game addiction, Defendants Roblox, Epic, and Microsoft have strategically targeted youths in their marketing and failed to provide adequate safety measures or warnings. Plaintiff raises claims of strict product liability based on Defendants' unreasonably dangerous products and their failure to warn of the dangers of video game addiction, negligence, intentional and negligent misrepresentation, and fraud.

Before playing any of these games, however, users must create accounts and agree to various terms of use. It is those terms that form the bases for Defendants' motions to compel arbitration and stay the proceedings before this Court.

### A.  Epic Accounts and the EULA

Epic developed the video game Fortnite, to which M.B. allegedly became addicted. *See* ECF No. 1 ¶ 9; *see also* Saunders Decl. ¶ 2, ECF No. 38-2. Before playing Fortnite, players must set up an account. *See* ECF No. 38-2 at ¶¶ 5, 23. There are two ways to do so: setting up an Epic account or a console-linked account. *Id.* In either case, players must enter their date of birth, their country, email address, and first and last names, and then choose a unique display name and password. ECF No. 38-2 ¶¶ 6, 9, 11, 23–24. Before a player may submit the information and complete the account creation process, they must check a box indicating they "have read and agree to the terms of service" and click "Continue." *Id.* ¶¶ 10–11.

After creating an Epic Games account and downloading the Fortnite software, players must log into their account. *Id.* ¶¶ 33–34. Once logged in, the EULA is displayed on screen. *Id.* Players may scroll through the EULA on the screen before deciding whether to accept its terms. *Id.* ¶¶ 32–34. They can "accept" or "decline" the EULA, but they cannot play Fortnite without accepting the

4

terms. *Id.* The EULA contains an arbitration clause requiring the parties to submit all disputes to arbitration, "including without limitation the validity, enforceability, or scope of this Binding Individual Arbitration section." EULA §§ 12.3–12.3.1, ECF No. 38-13 at 6. The EULA allows a time-limited right to opt out of the arbitration clause. *Id.* at 2 ("You have a time-limited right to opt out of this waiver."); *Id.* at 14 § 12.6 (describing procedure to opt out of arbitration provision, requiring user to send written notice to Epic).[2] By its terms, the EULA is subject to the Federal Arbitration Act ("FAA"). *See id.* at 11 § 12.3.

Epic located two accounts that matched information provided by M.B. ECF No. 38-2 ¶ 47. One was created on June 25, 2023 ("Epic Account #1"), and the second was created on April 19, 2025 ("Epic Account #2"). When creating both accounts, the user pressed the "accept" button on the screen displaying the EULA. *Id.* ¶¶ 55, 65. A player on Epic Account #1 agreed to the EULA three additional times, on November 19, 2023, December 19, 2024, and February 15, 2025. *Id*. ¶¶ 57, 59, 61. Players can accept the EULA only after logging in to their Epic Games account, which requires knowledge of the account's unique display name and password. *Id*. ¶ 34.

---

[2] The opt-out clause provides:

> You have the right to opt out of and not to be bound by the arbitration and class action waiver provisions set forth in this Agreement. To exercise this right, You must send written notice of your decision to the following address: Epic Games, Inc., Legal Department, ATTN: ARBITRATION OPT-OUT, Box 254, 2474 Walnut Street, Cary, North Carolina, 27518, U.S.A. Your notice ***must*** include your name, mailing address, and account name you use while playing Fortnite, and state that you do not wish to resolve disputes with Epic through arbitration. **To be effective, this notice must be postmarked or deposited within 30 days of the date on which you first accepted this Agreement unless a longer period is required by applicable law; otherwise you will be bound to arbitrate disputes in accordance with this section.** You are responsible for ensuring that Epic receives your opt-out notice, so you may wish to send it by a means that provides for a delivery receipt. If you opt out of these arbitration provisions, Epic will not be bound by them with respect to Disputes with you.

ECF No. 38-13 at 14.

Epic's records reflect that M.B. has used Epic Account #1 to play Fortnite many times since the filing of the Complaint on July 30, 2025, including as recently as September 20, 2025. ECF No. 38-2 ¶ 63. Epic received no opt-out notification for either of M.B.'s accounts. *Id.* ¶ 67.

### B. Roblox Account and the RTOU

Roblox operates an online platform where users can create virtual games, connect with other users to enjoy those user-created experiences, and acquire or use virtual apparel and other content that they and other users create. Decl. of Ronita Jit ("Jit Decl.") ¶ 4. To use the Roblox platform, users must create an account and agree to the RTOU. ECF No. 39-1 ¶ 8; *see also* Compl. ¶ 93, ECF No. 1 (alleging that "[i]ndividuals that wish to play Roblox must create a Roblox account."). A minor's "Responsible Adult" must agree on their behalf. *See* ECF No. 39-1 ¶¶ 9–11. The RTOU contains an arbitration clause that requires the parties to submit all disputes to arbitration, "including without limitation whether or not any part of these Terms is void or voidable." 2019 RTOU §§ 11.3.1, 11.3.4, Ex. 3 to Jit Decl., ECF No. 39-4 at 24.[3] By its terms, the RTOU is subject to the FAA. *See* ECF No. 39-8 at 24.

Following the initial account creation, when logged into their account, users are periodically required to accept updates to the RTOU when Roblox deems changes to be material. ECF No. 39-1 ¶ 8. A notice pops up on the screen and contains a bolded hyperlink to the updated RTOU; it also contains an "I Agree" button. *Id.* ¶¶ 9–12. The pop-up instructs minors to show the notice to their parent or guardian. *Id.* ¶¶ 9–11. The notice also appears in players' "Messages," and links to the RTOU. *Id.* ¶ 11. Players cannot continue using the Roblox platform unless and until they accept the updates. *Id.* They are given the option to either agree to the updated RTOU or close

---

[3] *See also* July 2020 RTOU, ECF No. 39-5 at 24–25; Mar. 2021 RTOU, ECF No. 39-6 at 20; Jan. 2022 RTOU, ECF No. 39-7 at 16; Aug. 2023 RTOU, ECF No. 39-8 at 20, 26; Feb. 2024 RTOU, ECF No. 39-9 at 23–24, 26; Mar. 2025 RTOU, ECF No. 39-10 at 16–17.

their Roblox accounts before the updates go into effect. *Id.* ¶ 11. Beginning in 2023, the RTOU allowed players to opt out of the RTOU's arbitration agreement by sending written notice to Roblox within 30 days of signing up for Roblox for the first time. *See* ECF No. 39-8 at 26–27; ECF No. 39-9 at 27; ECF No. 39-10 at 18. Players may also opt out of subsequent material changes within 30 days of Roblox sending notice. ECF No. 39-8 at 26–27; ECF No. 39-9 at 27; ECF No. 39-10 at 18.

M.B. played Roblox and could not have done so without a Roblox account. ECF No. 1 ¶¶ 9, 14, 93. Plaintiff's counsel provided Roblox's counsel an email address associated with Plaintiff's Roblox account. ECF No. 39-1 ¶ 6. Roblox's records reflect that that email address is associated with an account created on June 27, 2020 ("Roblox Account"). *Id.* That account remains open and was used as recently as November 19, 2025 (the date Roblox filed this motion). *Id.* ¶ 14. Roblox has no records of M.B. or a parent or guardian opting out of the arbitration agreement within 30 days of acceptance, as permitted by the agreement. *Id.* ¶ 14.

Players can also purchase Robux either directly through the Buy Robux page or by redeeming Robux gift cards. In either case, users must be logged into their Epic account to complete the purchase. The Buy Robux page contains a disclosure that by buying Robux, the user "agree[s] to the Terms of Use, which includes an agreement to arbitrate any dispute between [the user] and Roblox." *Id.* ¶¶ 17–18. Roblox's records show nine purchases of Robux on M.B.'s Roblox Account between April 11, 2022 and July 19, 2025, through the Apple App Store. *Id.* ¶ 20; Roblox Account Transactions, Ex. 1 to Jit Decl., ECF No. 39-2.

The website to redeem Robux gift cards also contains a statement that by redeeming the gift card, the user "agree[s] to our Terms of Use including the arbitration clause." ECF No. 39-1 ¶¶ 24–26. The physical gift cards also contain a similar disclosure. *See id.* ¶¶ 29–30. Roblox's

records reflect that M.B.'s Roblox Account redeemed Robux gift cards on 21 occasions between June 27, 2020 and October 29, 2025. *Id.* ¶ 28; Robux Gift Card Redemptions, Ex. 2 to Jit Decl., ECF No. 39-3.

### C. Microsoft and Xbox Accounts and the MSA

Microsoft is the creator of the Xbox video gaming system on which Roblox and Fortnite can be played. *See* ECF No. 1 ¶ 22. To use the Xbox platform, a player must create a Microsoft account and an associated Xbox account. Abbott Decl., ECF No. 42-3 ¶ 3; *see also* ECF No. 1 ¶ 219. When creating Microsoft and Xbox accounts, users must agree to the MSA. ECF No. 42-3 ¶ 5. The MSA includes an agreement to arbitrate disputes, which is defined broadly, and provides the court exclusive authority "to decide arbitrability, as well as formation, existence, scope, validity, and enforcement." *See* 2025 MSA, Ex. A to Scari Decl., ECF No. 42-5 at 2, 6, 26–27.[4] By its terms, the MSA is subject to the Federal Arbitration Act ("FAA"). Periodically, Microsoft updates the MSA. Scari Decl. ¶ 7, ECF No. 42-4. When that happens, users are notified through emails and pop-up notices. *Id.* The pop-up notices appear on the user's screen with a link to the updated MSA. *Id.* ¶ 7. Users must click on a button acknowledging the notice. *Id.* ¶ 9. If they do not click the button acknowledging the update, they cannot continue using the gaming system. *Id.*

M.B. played Fortnite and Roblox on an Xbox, using two accounts. *See* ECF No. 1 ¶ 9. Microsoft Account #1 and Xbox Account #1 were created on October 3, 2016 by Rochelle Tomlin. ECF No. 44-1 ¶ 10.a; ECF No. 44-2 ¶ 7.a. Xbox Account #1 remains open and was used to play

---

[4] Microsoft attached all previous versions of the MSA dating back to 2016. The terms in each are the same in relevant respect, *see* 2024 MSA, Ex. B to Scari Decl., ECF No. 42-6 at 2, 26–27; 2023 MSA, Ex. C to Scari Decl., ECF No. 42-7 at 2, 25–26; 2022 MSA, Ex. D to Scari Decl., ECF No. 42-8 at 2, 23–24; 2021 MSA, Ex. E to Scari Decl., ECF No. 42-9 at 2; 2020 MSA, Ex. F to Scari Decl., ECF No. 42-10 at 2; 2019 MSA, Ex. G to Scari Decl., ECF No. 42-11 at 2; 2018 MSA, Ex. H to Scari Decl., ECF No. 42-12 at 2; 2016 MSA, Ex. I to Scari Decl., ECF No. 42-13 at 2, except that before 2022, the MSA did not expressly give the court exclusive authority to decide issues of arbitrability, formation, existence, scope, validity and enforceability of the arbitration agreement, *see* ECF No. 42-9 at 22–23; ECF No. 42-10 at 22–23; ECF No. 42-11 at 22–23; ECF No. 42-12 at 22–23; ECF No. 42-13 at 19–20.

Roblox as recently as October 2025 (after the Complaint was filed). ECF No. 44-2 ¶ 7.a. Microsoft Account #2 and Xbox Account #2 were created on January 17, 2024 by M.B. ECF No. 44-1 ¶ 10.b; ECF No. 44-2 ¶ 7.b; Tulante Decl. ¶ 3, ECF No. 69-1. Xbox Account #2 also remains open and was last accessed on February 5, 2024. ECF No.44-2 ¶ 7.b.

## II.    Controlling Legal Principles

The FAA, 9 U.S.C. § 1 *et seq.*, "expresse[s] a strong federal policy in favor of resolving disputes through arbitration." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009). That strong federal policy, however, does not mean motions to compel arbitration should automatically be granted. *Id.* at 523. "A court can compel a party to arbitrate only if the party agreed to arbitration." *Zirpoli*, 48 F.4th at 142. Accordingly, before compelling the parties to arbitrate, courts "must consider two 'gateway' questions: (1) whether the parties have a valid arbitration agreement at all (i.e., its enforceability), and (2) whether a concededly binding arbitration clause applies to a certain type of controversy (i.e., its scope)." *In re Remicade*, 938 F.3d at 519 (cleaned up). Courts shall not apply a presumption of arbitrability at the first step. *Id.* at 520. However, federal law may come into play when considering the applicability of state law contract defenses if the application of the state law principle "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the FAA." *Id.* at 522 (quoting *Lamps Plus*, 587 U.S. at 183).

Where, as here, the arbitration agreement is not apparent on the face of the complaint, courts apply the summary judgment standard to determine whether, viewing the evidence in the light most favorable to the party opposing arbitration, there is a genuine factual dispute as to the existence, enforceability, or scope of the arbitration agreement. *Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 319–20 (3d Cir. 2024); *see also* Fed. R. Civ. P. 56. The moving party must establish the existence of an agreement to arbitrate by a preponderance of the evidence. *Simensky v. Experian*

9

*Info. Sols., Inc.*, No. 25-1045, 2025 WL 3754509, at *2 (3d Cir. Dec. 29, 2025) (citing *Gasbarre Prods., Inc. v. Smith*, 270 A.3d 1209, 1218 (Pa. Super. Ct. 2022)). Once the moving party produces sufficient evidence to show the absence of a genuine dispute as to formation, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must demonstrate specific facts that give rise to a genuine dispute as to whether an arbitration agreement was formed. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To determine whether an agreement to arbitrate was formed, courts look to ordinary state-law principles governing contract formation. *Century Indem. Co.*, 584 F.3d at 524. Under Pennsylvania law, which the parties agree applies, the Court considers: "(1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998). Manifestation of an intent to be bound is generally shown through offer and acceptance. *Refuse Mgmt. Sys., Inc. v. Consol. Recycling & Transfer Sys. Inc.*, 671 A.2d 1140, 1146 (Pa. Super. Ct. 1996). "Whether particular conduct expresses an offer and acceptance must be determined on the basis of what a reasonable person in the position of the parties would be led to understand by such conduct under all of the surrounding circumstances." *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alts., Inc.*, 764 A.2d 587, 593 (Pa. Super. Ct. 2000) (citation omitted).

Finally, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *see also Zirpoli*, 48 F.4th at 138. If the parties clearly and unmistakably delegate questions of arbitrability to the arbitrator, the

10

district court lacks authority to resolve those questions. *Zirpoli*, 48 F.4th at 138. However, even where questions of arbitrability have been delegated to an arbitrator, the Court must still resolve questions of whether a contract was formed. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) ("[W]here the dispute at issue concerns contract formation, the dispute is generally for the courts to decide.").

## III.   Non-binding Cases Compelling Arbitration in Video Game Addiction Litigation

Video game addiction cases like this one have been brought in jurisdictions throughout the United States. When faced with motions to compel arbitration based on similar terms of use, courts outside this Circuit have almost universally compelled arbitration. *See, e.g.*, *Antonetti v. Activision Blizzard, Inc.*, 764 F. Supp. 3d 1309 (N.D. Ga. 2025) (compelling arbitration where Epic identified plaintiff's account and rejecting plaintiff's argument that Epic produced insufficient evidence that the account actually belonged to him because plaintiff's refusal to confirm account credentials did "not create a 'genuine' dispute of material fact"); *Dunn v. Activision Blizzard, Inc.*, 749 F. Supp. 3d 976 (E.D. Ark. 2024) (compelling arbitration where plaintiff did not dispute that the minor child created user the accounts at issue and that account creation required acceptance of terms of use); *Johnson v. Activision Blizzard, Inc.*, No. 24CV00026, 2025 WL 679033 (E.D. Ark. Mar. 3, 2025) (same); *Orellana v. Roblox Corp.*, 769 F. Supp. 3d 1273 (M.D. Fla. 2025) (granting Epic's motion to compel arbitration); *Courtright v. Epic Games, Inc.*, 766 F. Supp. 3d 873 (W.D. Mo. 2025) (same); *Angelilli v. Activision Blizzard, Inc.*, No. 23-cv-16566, 2025 WL 524276 (N.D. Ill. Feb. 18, 2025) (same and rejecting argument that parental consent was a condition precedent to minor's acceptance); *Ayers v. Epic Games, Inc.*, No. 24-cv-64 (N.D. Fla. Jan. 27, 2025) (Dkt. 162) (compelling arbitration based on acceptance of updated agreements containing arbitration clause).

## IV.   Discussion

### A.  M.B. Entered a Binding Arbitration Agreement with Epic.

Epic argues that M.B. agreed to arbitrate all disputes related to Fortnite by accepting the EULA's terms as a prerequisite to playing. *See* ECF No. 38-1 at 15–18. In opposition, Plaintiff first argues Epic has produced insufficient evidence that M.B. was actually the person on the other side of the screen "accepting" the EULA either upon account creation or when the terms were updated. The Court disagrees.

"Under Pennsylvania law, contracts are enforceable merely by showing that the parties manifest an intent to be bound by the terms of the agreement (i.e., offer and acceptance)." *Juric v. Dick's Sporting Goods, Inc.*, No. 20-CV-00651, 2020 WL 4450328, at *10 (W.D. Pa. Aug. 3, 2020). This can be accomplished through an electronic agreement, where there are records showing the plaintiff was the actor electronically agreeing to the terms. *Id.* For example, where a plaintiff identifies himself with the last four digits of his Social Security number, that is sufficient to "indicate[] that it was Plaintiff, and not some other person – whom Plaintiff has not even attempted to identify – who electronically signed the form." *Schrock v. Nomac Drilling, LLC*, No. 15-cv-1692, 2016 WL 1181484, at *4 (W.D. Pa. Mar. 28, 2016). Even a plaintiff's denial that they agreed to arbitration does not overcome electronic records that show otherwise. *Id.* ("Plaintiff's naked assertions that he never [signed the forms] are insufficient to lead the Court to conclude otherwise."); *see also Juric*, 2020 WL 4450328 at *10 (collecting cases showing courts reject challenges based on plaintiffs' denials of agreeing to arbitration where electronic records prove otherwise). Like the use of the Social Security number as an identifier in *Schrock*, Epic requires users to log in to their Epic accounts with a unique display name and password before agreeing to the EULA, sufficiently indicating the account holder clicked "Accept."

The undisputed evidence before the Court shows that Epic offered M.B. the opportunity to play Fortnite in exchange for M.B.'s agreement to the EULA. M.B. accepted and played Fortnite, which M.B. could not have done without accepting the EULA's terms. *See* ECF No. 1 ¶ 9; ECF No. 38-2 ¶ 32. M.B. played Fortnite by creating and logging into two Epic accounts, each of which was established with an email address, first and last name, a unique display name, and a password which was chosen by the account creator. ECF No. 38-2 ¶¶ 9, 14, 23, 46–53. When the EULA was updated, the player on M.B.'s account with M.B.'s unique display name and password had to accept the updated terms and did so on multiple occasions. *See* ECF No. 43-8 at 2.

Plaintiff does not actually dispute any of the above facts. Rather, Plaintiff argues that "Defendant does not know who specifically performed any of these actions such that a contract was validly formed with that particular individual." ECF No. 56 at 13.[5] In this Court's view, that does not create a *genuine* dispute. *See Antonetti*, 764 F. Supp. 3d at 1319–20. Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586. Plaintiff has not done so here—Plaintiff concedes the Epic accounts belong to M.B. and provides no affirmative evidence that anyone else had access to the accounts or participated in their creation. The mere speculation that someone else could have had M.B.'s unique log-in information and could have been using M.B.'s account when the terms were updated

---

[5] Plaintiff cites to two cases that denied motions to compel arbitration. *See* ECF No. 56 at 12–13 (first citing *John Doe v. Roblox Corp., et al.*, No. 25-CIV-01193 (Cal. Super. Ct. Aug. 15, 2025); and then citing *Murphy v. Roblox Corp.*, No. 23-cv-1940, 2025 WL 2327100 (S.D. Cal. July 9, 2025)). The Court finds these cases unpersuasive. In particular, the plaintiff in *Murphy* was the father of a minor Roblox account holder, who submitted affirmative evidence in the form of declarations, denying he agreed to the RTOU through engaging in any transaction with Roblox. *Murphy*, 2025 WL 2327100 at *6 (describing the father's denials as "specifically disclaim[ing] having 'personally' made . . . 'any purchases or payments to Roblox" and noting the father "admits only to having personally purchased with cash gift cards that his children could redeem for Robux," which were not the basis for the father's alleged agreement to arbitrate). Plaintiff here submitted no affirmative evidence denying they used or created the accounts. *Doe*, meanwhile, involved less identifying information related to the account at issue than the defendants provided here, and the court recognized that additional identifying information could support a renewed motion to compel arbitration. ECF No. 56-3.

is insufficient to establish a *genuine* dispute. *See Schrock*, 2016 WL 1181484 at *3–4 (finding electronic records showing plaintiff was required to use private login information, known only to him, to electronically acknowledge an arbitration agreement sufficient to establish formation). Accordingly, the Court finds a contract was formed between M.B. and Epic.[6]

### B. M.B.'s Responsible Adult Entered a Binding Arbitration Agreement with Roblox for M.B.'s Benefit.

Roblox first argues M.B. agreed to arbitrate all disputes based on M.B.'s redemption of Robux gift cards. ECF No. 39 at 13. Roblox then argues M.B. is bound by the RTOU's arbitration clause as a third-party beneficiary because Tomlin (M.B.'s "Responsible Adult") accepted the RTOU's terms when setting up the Roblox Account and each time the RTOU was updated. *See* ECF No. 39 at 3–4, 12 ("Roblox's Terms prohibited Plaintiff continuing to use Roblox's Platform without Plaintiff's Responsible Adult first agreeing to the updated Terms."). In opposition, Plaintiff again argues Roblox has produced insufficient evidence of who was actually on the other side of the screen "accepting" the RTOU, either during account setup, when the terms changed, or when purchasing Robux. ECF No. 58 at 12–14. Plaintiff also argues that even if M.B. is a third-party beneficiary to an agreement formed between Tomlin and Roblox, M.B. cannot be bound by the arbitration clause under Pennsylvania law.

---

[6] Plaintiff discusses the Uniform Electronic Transactions Act ("UETA"), 73 P.S. § 2260, seemingly in support of the argument that Defendants have not sufficiently established who agreed to the terms of the agreements. However, Plaintiff does not explain how the UETA affects the circumstances here. Moreover, the UETA validates clickwrap agreements like those at issue here. *See* 73 P.S. § 2260.310(2); *id.* at cmts. 2–3 ("The process in paragraph (2) validates an anonymous click-through transaction. . . . If the owner can show that the only way A could have obtained the information was from his website, and that the process to access the subject information required that A must have clicked the 'I agree' button after having the ability to see the conditions on use, A has performed actions which A was free to refuse, which A knew would cause the site to grant her access, i.e., 'complete the transaction.' The terms of the resulting contract will be determined under general contract principles, but will include the limitation on A's use of the information, as a condition precedent to granting her access to the information."). This is consistent with cases applying Pennsylvania law, which generally enforce clickwrap agreements. *Pricharda v. Checkr, Inc.*, No. 22-cv-3180, 2022 WL 16749033, at *3 (E.D. Pa. Nov. 7, 2022) (collecting cases).

The undisputed evidence before the Court shows that Roblox offered M.B. the opportunity to play Roblox in exchange for M.B.'s Responsible Adult's agreement to the RTOU. M.B. played Roblox through use of the Roblox Account, which M.B. could not have done without M.B.'s Responsible Adult's acceptance of the RTOU. *See* ECF No. 1 ¶ 9; ECF No. 39-1 ¶ 6. Each time the RTOU was updated, M.B.'s Responsible Adult had to accept the updated terms and did so on multiple occasions. *See* ECF No. 39-1 ¶¶ 12–13; *see also* 2020 RTOU, ECF No. 39-5 at 5 (warning account holders not to share their password or personal information and prohibiting use of their account by anyone other than their parent or guardian). The Roblox Account remains open and was used as recently as the date Roblox filed the instant motion. ECF No. 39-1 ¶ 14. Robux were purchased and Robux gift cards were redeemed on the Roblox Account on multiple occasions. ECF Nos. 39-2 & 39-3.

With respect to M.B.'s independent acceptance of the RTOU specifically through the redemption of Robux gift cards, there is insufficient evidence before the Court as to who redeemed them—M.B. or M.B.'s Responsible Adult. This argument differs from Epic's because Epic contended that M.B. independently agreed to the EULA through the creation and continued use of the Epic Accounts. Roblox does not rely on the Roblox Account creation or use that act as a basis for M.B.'s independent agreement to the RTOU. While it is clear that gift cards were redeemed by someone using the Roblox Account with M.B.'s unique log-in information, it is less clear who that was. The RTOU does not permit the sharing of accounts with anyone other than the minor player's Responsible Adult. *See* ECF No. 39-4 at 5. That, along with Roblox's contention that M.B.'s Responsible Adult agreed to the RTOU, necessarily creates the inference that both M.B. and M.B.'s Responsible Adult had access to the Roblox Account. Thus, on the record before it, the Court finds

15

there is a genuine dispute as to whether it was M.B. who redeemed the gift cards, thereby independently accepting the RTOU.

Nonetheless, the Court can conclude that M.B.'s Responsible Adult accepted the RTOU's terms, that M.B. is a third-party beneficiary to that agreement, and that M.B. may be bound by the arbitration clause as an intended third-party beneficiary. ECF No. 39 at 13. Plaintiff does not affirmatively dispute that M.B.'s Responsible Adult agreed to the RTOU. Plaintiff also does not dispute that M.B. is a third-party beneficiary to the RTOU. Finally, Plaintiff does not contest the general rule that third-party beneficiaries to contracts may be bound by arbitration clauses contained therein may apply to adults.[7] Instead, Plaintiff argues that because M.B. is a minor, M.B. cannot be bound by an arbitration provision within a contract to which M.B. is a non-signatory. ECF No. 58 at 17, 18 n.3. Plaintiff bases this argument on a recent Pennsylvania Supreme Court case, which prohibits enforcement of arbitration clauses contained in agreements entered by parents on behalf of their minor children. The Court addresses this argument in Part IV.E below.

### C. The RTOU and EULA Delegate Issues of Disaffirmance and Unconscionability to the Arbitrator.

Plaintiff next argues that even if M.B. did agree to the EULA, M.B. cannot be bound by the arbitration agreement because minors are not competent to contract and M.B. disaffirmed any agreement to arbitrate.[8] Plaintiff also argues the EULA and RTOU are unconscionable. Epic and

---

[7] The cases Roblox cites establish that intended third-party beneficiaries are bound by arbitration provisions contained in contracts where their "claims arise out of the underlying contract." *Doeff v. Transatl. Reins. Co.*, No. 07-2110, 2007 WL 4373041, at *2 (E.D. Pa. Dec. 13, 2007) (citing *E.I. Dupont De Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001)). Plaintiff does not argue otherwise, so the Court accepts Roblox's contention that M.B.'s claims arise out of the RTOU. *Markert v. PNC Fin. Servs. Grp., Inc.*, 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011) ("When an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue.").

[8] Plaintiff raised this argument with respect to Roblox's motion as well; however, because the Court does not conclude M.B. independently agreed to the RTOU, it does not address M.B.'s minority with respect to that agreement.

Roblox argue that their agreements delegate these issues to the arbitrator. The Court agrees with Defendants.

As an initial matter, it is true that under Pennsylvania law, "[m]inors lack the capacity to agree to an arbitration agreement or any other contract in their own right." *Santiago v. Philly Trampoline Park, LLC*, 291 A.3d 1213, 1224 (Pa. Super. Ct. 2023), *aff'd* 343 A.3d 995 (Pa. 2025). However, a contract with a minor is voidable, *not* void. *Id.* This distinction is important because a "void" contract was unenforceable from the outset, meaning an enforceable contract was never formed; whereas, a "voidable" contract was formed and only becomes unenforceable if the minor disaffirms it. *Aetna Cas. & Sur. Co. v. Duncan*, 972 F.2d 523, 526 (3d Cir. 1992); *see also* Restatement (Second) of Contracts § 7. Thus, M.B.'s capacity to contract as a minor is not a question of formation. The same is true of unconscionability. Even if a contract was unconscionable, that does not mean it was not formed. *See Wiggins v. Lab'y Corp. of Am. Holdings*, No. 24-0648, 2024 WL 4476646, at *6 n.3 (E.D. Pa. Oct. 11, 2024). Where questions of enforceability have been delegated to the arbitrator, the Court lacks the authority to resolve them.

"[P]arties to a contract may delegate questions of arbitrability to an arbitrator. If parties clearly and unmistakably make this choice, then district courts generally must send threshold questions of arbitrability to arbitration to comply with the parties' agreement." *Zirpoli*, 48 F.4th at 138 (emphasis removed). So long as the party opposing arbitration does not specifically challenge the enforceability of the delegation clause itself—as opposed to the contract or arbitration provision as a whole—the Court "possesses no power to decide the arbitrability issue." *Scott v. CVS*, No. 22-3314, 2023 WL 3477827, at *1 (3d Cir. May 15, 2023) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019)).

17

The delegation clauses of the EULA and the RTOU clearly and unmistakably delegate questions of enforceability to the arbitrator. *See* ECF No. 38-13 at 6 (EULA requiring parties to submit all disputes to arbitration, "including without limitation the validity, enforceability, or scope of this Binding Individual Arbitration section"); ECF No. 39-4 at 24 (RTOU requiring parties to submit all disputes to arbitration, "including without limitation whether or not any part of these Terms is void or voidable").

Plaintiff's argument that the Court has the authority to consider whether M.B. disaffirmed the agreements fails for the additional reason that Plaintiff does not specifically challenge the arbitration or delegation clauses. Plaintiff argues they have "challenged the validity of the entire EULA, which necessarily includes the validity of the included delegation clause." ECF No. 56 at 18. That is not the kind of specific challenge courts look for. "[A] party seeking to avoid arbitration must directly challenge the arbitration or delegation clause, not just the contract as a whole." *Young*, 119 F.4th at 321 (quoting *Coinbase, Inc. v. Suski*, 602 U.S. 143, 150–51 (2024)); *see also Steinberg v. Capgemini Am., Inc.*, No. 22-489, 2022 WL 3371323, at *8 (E.D. Pa. Aug. 16, 2022) (holding that plaintiff's "unconscionability objections should be resolved by the arbitrators" where plaintiff "failed to challenge the delegation provision specifically"). Plaintiff's admission that they challenge the enforceability of the EULA as a whole is fatal to this argument.

For these reasons, the Court cannot consider Plaintiff's arguments as to disaffirmance or unconscionability as they relate to the EULA or the RTOU. Instead, Plaintiff should raise those issues before the arbitrator.

### D. M.B. Entered a Binding Arbitration Agreement with Microsoft, and Tomlin Entered a Binding Arbitration Agreement with Microsoft for M.B.'s Benefit.

Microsoft argues that M.B. should be compelled to arbitrate their claims for three reasons: (1) M.B. directly agreed to arbitrate with Microsoft by both creating a Microsoft account and by

18

using Microsoft's Xbox services for years; (2) even if M.B. had not created an account and used Microsoft's services, M.B. would be bound as a third-party beneficiary to the MSA because M.B.'s mother, Tomlin, created an account for M.B. to use; and (3) even if these theories did not apply, M.B. would be equitably estopped from repudiating the arbitration agreement with Microsoft after years of receiving the benefits that flowed from accepting the MSA's terms. ECF No. 42-1 at 7. Plaintiff argues in opposition that (1) Microsoft has produced insufficient evidence to establish who accepted the MSA; (2) even if M.B. independently accepted the MSA, M.B. properly disaffirmed it; and (3) M.B. cannot be bound to arbitrate as a third-party beneficiary because under Pennsylvania law, parents lack the authority to waive their minor child's access to courts for their claims. *See* ECF No. 57 at 7–8.

### 1. M.B. and Tomlin Agreed to the MSA.

It is undisputed that a user cannot play on an Xbox without setting up a Microsoft and Xbox account, which requires agreement to the MSA. ECF No. 42-3 ¶¶ 3–5; ECF No. 42-4 ¶¶ 3–4. It is also undisputed that M.B. used two accounts to play Fortnite and Roblox on an Xbox. ECF No. 67-1 ¶¶ 3–4; ECF No. 1 ¶ 9. Plaintiff first identified the gamertag and email address associated with Microsoft and Xbox Account #1 as M.B.'s. ECF No. 42-3 ¶ 7; ECF No. 44-2 ¶ 7; ECF No. 69-1 ¶ 3. After Microsoft identified a second account as possibly belonging to M.B., Plaintiff confirmed Microsoft and Xbox Account #2 belonged to M.B. ECF No. 67-1 ¶ 4. Microsoft Account #1 and Xbox Account #1 were created on October 3, 2016 by Rochelle Tomlin, and Microsoft Account #2 and Xbox Account #2 were created on January 17, 2024 by M.B. ECF No. 44-1 ¶ 10; ECF No. 44-2 ¶ 7; *see also* ECF No. 69-1 ¶ 3. It is also undisputed that both accounts remain open, and M.B. has continued to play Roblox and Fortnite on Xbox since this action was initiated. *See* ECF No. 44-2 ¶ 7.

This evidence sufficiently establishes that contracts were formed between M.B. and Microsoft and between Tomlin and Microsoft. Microsoft offered M.B. the opportunity to use the Xbox platform to play video games in exchange for agreeing to the MSA, including its arbitration clause. M.B. and Tomlin accepted the MSA by creating accounts and later accepting updated terms. In consideration of the agreement, M.B. was able to continue playing on the Xbox console. *See ATACS Corp.*, 155 F.3d at 666 (explaining a contract requires manifestation of intent to be bound, sufficiently definite terms, and consideration); *Refuse Mgmt. Sys.*, 671 A.2d at 1146 (explaining manifestation of intent to be bound is generally shown through offer and acceptance). Plaintiff provides no evidence to the contrary, nor does Plaintiff deny creating the accounts or accepting the updates to the MSA. Instead, Plaintiff asserts that Microsoft has produced insufficient evidence of who was sitting on the other side of the screen when the terms were accepted. The accounts are clearly linked to M.B.'s and Tomlin's names and email addresses. M.B. and Tomlin necessarily had to accept the MSA's terms to create and continue using those accounts. Plaintiff puts forth no affirmative evidence that anyone else had access to or used the accounts. Mere speculation that it could have been someone else with access to M.B.'s accounts does not create a *genuine* dispute of material fact. *See Simensky*, 2025 WL 3754509 at *3; *see also Antonetti*, 764 F. Supp. 3d at 1319–20 ("The undisputed facts before the Court . . . are that Epic presented the March 2019 EULA, which contained the above cited arbitration and delegation provisions, to [plaintiff], who necessarily accepted the provisions because he continued playing Fortnite thereafter. . . . These facts are sufficient for the Court to find that a valid contract was formed under North Carolina law."); *Juric*, 2020 WL 4450328 at *10 (collecting cases showing even a plaintiff's denial that they agreed to arbitration does not overcome electronic records that prove otherwise). Accordingly, the

Court finds that contracts were formed between M.B. and Microsoft and between Tomlin and Microsoft under Pennsylvania law.

### 2. M.B. Did Not Disaffirm the MSA.

Plaintiff next argues that even if a contract was formed, it is unenforceable against M.B. because M.B. is a minor who is incompetent to contract and that M.B. disaffirmed the MSA by filing the Complaint. Unlike Roblox's and Epic's agreements, Microsoft's MSA does not delegate this question to the arbitrator.

As noted above, a minor must disaffirm a contract to avoid its enforcement. *Duncan*, 972 F.2d at 526; *see also* Restatement (Second) of Contracts § 7. Plaintiff invokes *Hanes v. Fitzgerald* for the proposition that filing a complaint operates as disaffirmance of a contract. 165 A. 52, 55 (Pa. Super. Ct. 1933). While filing a complaint *may* operate as disaffirmance, disaffirmance "is not to be employed as a vehicle whereby the minor is enabled to practice unconscionable business methods. It is a shield for defense, not a sword for offense." *Duncan*, 972 F.2d at 526 (quoting *Pankas v. Bell*, 198 A.2d 312, 315 (Pa. 1962)). Moreover, a minor cannot ratify the parts of the contract that are favorable to them and disaffirm the parts that are not. *See* Restatement (Second) of Contracts § 380 ("A party who has the power of avoidance may lose it by action that manifests a willingness to go on with the contract."); *see also* 3 Williston on Contracts § 7:14 (4th ed.) ("A minor may be estopped to cancel, rescind or terminate its own contract if, for example, the minor wants to affirm those provisions of [the] agreement that are favorable to it and repudiate those portions of the contract that are burdensome or unfavorable. A minor may not retain the benefits of a contract and, at the same time, try to repudiate its obligations under the agreement.").

Here, there is a clear tension between M.B.'s purported disaffirmance of the MSA and the fact that M.B. continues to play games on the Xbox. If M.B. had stopped using the Xbox Accounts after filing the Complaint, the Court would be more inclined to consider that M.B. had properly

21

disaffirmed the MSA. However, Microsoft has established that M.B. continued to play Roblox and Fortnite for over two months after filing the Complaint. Disaffirmance does not generally require a minor to return received, contracted-for benefits that they no longer possess. *See* Restatement (Second) of Contracts §14 ("If sued upon the contract, [an infant] may defend on the ground of infancy without returning the consideration received."). Even so, to allow the minor to continue receiving additional benefits (as opposed to returning benefits they no longer have) while disaffirming only the part of the agreement that does not favor them would be to allow them to use disaffirmance as a sword, not just a shield. *See E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 899–900 (S.D. Ill. 2012) (concluding plaintiffs could not disaffirm forum-selection clause in Facebook's terms of use, even though they were minors when they entered the agreement, because they had used and continued to use facebook.com); *see also Morrow v. Norwegian Cruise Line Ltd.*, 262 F. Supp. 2d 474, 476 (M.D. Pa. 2002) (enforcing forum selection clause against minor who was injured on a cruise where she could "not give back, or in any way disgorge, the benefit of her contract, [so] it would be inequitable to now release her from the obligations and consequences attached to that benefit").

M.B. receives new benefits from the MSA each time M.B. plays a game using the Xbox Accounts. In asserting disaffirmance as a means of avoiding the arbitration clause, M.B. seeks to benefit from the MSA while disaffirming only that portion of the agreement Plaintiff finds unfavorable. It would be inequitable to allow such a result, and it would be contrary to the purpose of disaffirmance—to protect minors with a shield, not arm them with a sword. The Court finds M.B. has not disaffirmed the MSA, and its terms must be enforced.[9]

---

[9] The Court shares Plaintiff's concerns relating to a minor's capacity to contract, in particular their ability to understand the rights they are giving up by simply clicking "Next" or "I agree." *See* McBride Decl., ECF Nos. 56-1, 57-1, 58-1 (explaining that Defendants' agreements are far above the reading and comprehension level of a minor child between the ages of 9 and 13). This is especially concerning in the context of this Complaint, which cites to studies in brain

### 3.  Plaintiff's Argument as to the MSA's Unconscionability is Waived.

Plaintiff seeks discovery to present an unconscionability argument. In support, Plaintiff attaches a declaration from Dennis K. McBride, Ph.D., who opines that the MSA is not a comprehensible contract for minors of M.B.'s age and that any assent by a minor "reflects design-induced compliance rather than informed understanding under established human-factors and COPPA-aligned principles." ECF No. 57-1 at 6. When forming these opinions, Dr. McBride "did not have access to the exact historical version of the [MSA] presented to [M.B.]," so he used currently available versions. *Id.* at 4. Plaintiff does not explain how Dr. McBride's opinion would establish that the MSA is unconscionable, even based on its currently available version, and the Court cannot and will not craft arguments on Plaintiff's behalf.

Instead, Plaintiff argues, in a single paragraph, that the MSA might be unconscionable, but that the argument could not be fully developed because Microsoft selectively presented only portions of the MSA and the enrollment process. ECF No. 57 at 25–26. This argument lacks merit. Microsoft provided the full text of every version of the MSA that has been in effect since 2016. *See* ECF Nos. 42-5, 42-6, 42-7, 42-8, 42-9, 42-10, 42-11, 42-12, 42-13. This includes the MSA in

---

science and addiction disorders stemming from the use of technologies like Defendants' games. *See* ECF No. 1 ¶¶ 33–52 (describing almost two decades of research showing the severe impact of video game usage on adolescents' brains and the recognition of gaming addiction as a diagnosable mental disorder). Indeed, as technology and video games become more prevalent in our society, even very young children understand that to get to the next screen or the next game, they need only click the button. It strains credulity to believe that young children understand that in doing so, they are entering a legal contract. Unfortunately, however, the law has not caught up with the realities of the technologies children are faced with each day. *See* Brandon Ihle, The Infancy Doctrine: An Epic Departure, 52 Tex. Tech L. Rev. 339 (2020) (discussing EULAs, including Epic's, and criticizing courts' narrowing of the infancy doctrine, which allows minors to avoid contract enforcement through disaffirmance). Clickwrap agreements are enforceable just like any other contract. That means, under Pennsylvania law, those contracts are not void merely because of minority or incapacity, *Duncan*, 972 F.2d at 526, and under federal law, arbitration agreements are enforceable notwithstanding the clear unequal bargaining power between consumers and large corporations.

The outcome is thus: to avoid enforcement of the contract, a child suffering from addiction must cease using the product to which they are addicted. It removes the child's claims from the forum where they would receive judicial oversight when the very harm for which they seek a remedy makes disaffirmance uniquely challenging. This is a harsh result. However, the parties have pointed to no case law, and the Court has found none, that would allow it to find these contracts void based on M.B.'s incapacity. Disaffirmance is required, and it must be complete. *See* Restatement (Second) of Contracts § 380; 3 Williston on Contracts § 7:14; *Morrow*, 262 F. Supp. 2d at 476.

effect when Tomlin and M.B. created the Microsoft Accounts, as well as the updated versions of the MSA Tomlin and M.B. had to later accept. Microsoft also described the enrollment process with images of each step. *See* ECF Nos. 42-3 & 42-4. To the extent Plaintiff argues this description was "selectively presented," Plaintiff personally enrolled in Microsoft and Xbox accounts and could have rebutted Microsoft's evidence with Plaintiff's own experience. Plaintiff's failure to develop any argument about to the MSA's unconscionability amounts to a waiver of the argument. *See Markert v. PNC Fin. Servs. Grp.*, 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011) ("Throw-away arguments left undeveloped are . . . considered waived."). Moreover, Plaintiff does not identify any additional discovery that would support an unconscionability argument based on the enrollment process. Arbitration discovery is improper where a plaintiff "fail[s] to specify additional facts sufficient to place the agreement to arbitrate in issue." *See Williams v. Red Stone, Inc.*, No. 18-cv-2747, 2019 WL 9104166, at *3 (E.D. Pa. Mar. 25, 2019). Plaintiff's request for discovery is, therefore, denied.

### E. M.B. Is Bound to Arbitrate as a Third-Party Beneficiary to the MSA and the RTOU.

As noted above, M.B. is a third-party beneficiary to the agreement between M.B.'s Responsible Adult and Roblox based on the creation of the Roblox Account. Additionally, even if M.B. had not independently agreed to the MSA, M.B. was a third-party beneficiary to the agreement between Tomlin and Microsoft in connection with Microsoft and Xbox Account #1. Plaintiff does not dispute M.B. is a third-party beneficiary to the RTOU or the MSA. Instead, Plaintiff argues that Tomlin could not waive M.B.'s right to litigate M.B.'s claims in court because parents cannot bind their minor children to an agreement to arbitrate under Pennsylvania law. Roblox and Microsoft argue the FAA preempts the Pennsylvania law that prohibits parents from entering an arbitration agreement on behalf of (or for the benefit of) their minor child. According

to Roblox and Microsoft, therefore, the RTOU and MSA are enforceable against M.B. as a third-party beneficiary. The Court again agrees with Defendants.

The Court accepts Defendants' uncontested assertions that M.B. is a third-party beneficiary to the agreement between Tomlin and Defendants. Plaintiff does not address Defendants' arguments that under Pennsylvania law, third-party beneficiaries to contracts are generally bound by arbitration clauses contained therein.[10] Plaintiff focuses instead on a recent Pennsylvania Supreme Court ruling, which would exempt minors who are non-signatories to a contract from being bound by arbitration provisions contained therein.

*Santiago v. Philly Trampoline Park, LLC* found that "parents are without authority to bind a minor child to an agreement to arbitrate" under traditional agency principles. 343 A.3d at 1015. In so holding, *Santiago* explained that Pennsylvania has a "long-standing policy of protecting minors," which is reflected in the Pennsylvania Rules of Civil Procedure's special requirements for court oversight of minors' actions. *Id.* at 1010–11. Additionally, *Santiago* noted that arbitration "strips the minor of the[] [procedural] protections" of court oversight of their claims, and that the right to have claims adjudicated in a court is a property right, which parents cannot forfeit on their child's behalf. *Id.* at 1014–15.[11]

---

[10] The cases Microsoft cites establish that intended third-party beneficiaries are bound by arbitration provisions contained in contracts where their "claims arise out of the underlying contract." *Doeff v. Transatl. Reins. Co.*, No. 07-2110, 2007 WL 4373041, at *2 (E.D. Pa. Dec. 13, 2007) (citing *E.I. Dupont De Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001)). Because Plaintiff does not argue otherwise, the Court assumes without deciding that M.B.'s claims arise out of the MSA. *Markert v. PNC Fin. Servs. Grp., Inc.*, 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011) ("When an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue."). Roblox additionally cites *Angelilli*, which enforced arbitration agreements against a minor on a third-party beneficiary theory. 2025 WL 524276 at *12, *19. *Angelilli* applied Illinois law. *Id.* at *4.

[11] Notably, the defendant in *Santiago* did not argue the minor should be bound as a third-party beneficiary or based on equitable estoppel, and the Court explicitly stated those theories were not considered. *See Santiago*, 343 A.3d at 1004, 1009. While Microsoft argues *Santiago* is distinguishable, it does not elaborate on why *Santiago*'s holding would not extend to a third-party beneficiary theory. The Court, therefore, assumes without deciding that the same principles would apply under Pennsylvania law.

Roblox argues first that *Santiago* is based on the Pennsylvania Rules of Civil Procedure, which do not apply in federal court. The Court disagrees. Although *Santiago* refers to the Pennsylvania Rules of Civil Procedure as evidence of the state's strong policy in favor of protecting minors' interests, the case establishes a substantive rule that parents cannot act as the agent of their minor child when contracting away their right to court oversight of their claims. *See id.* This substantive law would apply in federal court. *See Talley v. Pillai*, 116 F.4th 200, 207 n.6 (3d Cir. 2024) ("[A] federal court sitting in diversity must apply state substantive law and federal procedural law.").

Roblox and Microsoft argue next that *Santiago*'s holding, which would treat arbitration agreements differently than other contracts, is preempted by the FAA. The FAA embodies "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (citation omitted). When applying state law principles to determine an arbitration clause's enforceability, "federal law may . . . come into play by way of preemption." *In re Remicade*, 938 F.3d at 522. "For example, federal law will preempt otherwise-applicable state law that would invalidate an agreement to arbitrate not simply by application of generally applicable contract defenses, such as fraud, duress, or unconscionability, but rather because it violates the FAA's so-called 'equal-treatment principle'—that is, if it applies only to arbitration or derives its meaning from the fact that an agreement to arbitrate is at issue." *Id.* (cleaned up).

*Santiago* conflicts with the FAA and Supreme Court precedent in several ways. First, it characterizes arbitration agreements as uniquely waiving a minor's substantive rights, while federal law characterizes them as "a specialized kind of forum-selection clause," which does "not alter or abridge substantive rights" but "merely changes how those rights will be processed."

*Santiago*, 343 A.3d at 1015–16 (Brobson, J., dissenting in relevant part) (quoting *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 (2022)). Indeed, the Supreme Court has stated that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits their resolution in an arbitral . . . forum." *Viking River Cruises*, 596 U.S. at 653 (quoting *Preston v. Ferrer*, 522 U.S. 346, 359 (2008)).

Furthermore, *Santiago* violates the FAA's "equal-treatment principle" because it treats arbitration agreements differently than other contracts. *In re Remicade*, 938 F.3d at 522 (quoting *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246, 251 (2017)). The FAA provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA requires courts to "place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *Concepcion*, 563 U.S. at 339 (citations omitted). The FAA's "saving clause," which "permits agreements to arbitrate to be invalidated by generally applicable contract defenses," does not allow for "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* at 339 (cleaned up). Accordingly, "[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012) (per curiam) (alteration in original) (quoting *Concepcion*, 563 U.S. at 341). Three Supreme Court cases are illustrative of these principles.

*Concepcion* reversed the Ninth Circuit's finding that arbitration agreements containing class action waivers were unconscionable and, therefore, unenforceable. 563 U.S. at 338, 352. The

Court explained that even when a doctrine appears generally applicable, if applied in a fashion that disfavors arbitration, it may be preempted. *Id.* at 341. For example, if a court were to find that waiver of judicially monitored discovery was against public policy, though that principle may appear applicable to any contract, it "would have a disproportionate impact on arbitration agreements." *Id.* at 341–42. The Court reasoned that the FAA's saving clause "cannot in reason be construed as allowing a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself." *Id.* at 343 (cleaned up). "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." *Id.* at 351.

Similarly, *Marmet Health Care Center* vacated a state supreme court's invalidation of arbitration clauses in nursing home admission agreements as they related to later acts of negligence causing personal injury or wrongful death. 565 U.S. at 532. The Court emphasized that such "a categorical rule prohibiting arbitration of a particular type of claim . . . is contrary to the terms and coverage of the FAA." *Id.*

Finally, *Kindred Nursing Centers* struck down a state court holding that "an agent could deprive her principal of an 'adjudication by judge or jury' only if the power of attorney 'expressly so provided.'" 581 U.S. at 250–51 (cleaned up). The state court believed that this holding complied with the FAA because it would apply to any agreement implicating "fundamental constitutional rights," like the rights of access to the courts and trial by jury. *Id.* The Supreme Court disagreed, explaining that the state's requirement of a "clear statement" delegating authority to enter arbitration agreements "fail[ed] to put arbitration agreements on an equal plane with other contracts." *Id.* at 252. The Court could not identify any other contract to which this rule would apply, which made the rule's "arbitration-specific character" clear. *Id.* at 254.

Turning to the Pennsylvania law at issue here, the Court asks whether the rule espoused in *Santiago* is generally applicable to all contracts involving minors or if it applies uniquely to or disproportionately impacts agreements to arbitrate. Although *Santiago*'s general principles—that public policy supports protection of minors' rights and that a minor's parents cannot contract away their rights without court supervision—are grounded in generally applicable policies, *Santiago* did not hold that a parent cannot enter *any* contract on a minor's behalf. Rather, it prohibited parents from entering an arbitration agreement on their child's behalf—*i.e.*, waiving a minor's procedural right to have court supervision over their claims. 343 A.3d at 1012. Like the rule *Kindred Nursing Centers* invalidated, *Santiago*'s rule fails to put arbitration agreements involving minors' claims on an equal plane with other contracts. For example, *Santiago*'s holding would not invalidate a car lease entered into by a parent on behalf of a minor. The minor would still have to independently disaffirm such a contract upon reaching majority to avoid enforcement. Nor would *Santiago* invalidate any of the MSA's terms here, except for the arbitration clause.

In this Court's view, *Santiago*'s rule "derive[s] [its] meaning from the fact that an agreement to arbitrate is at issue." *Kindred Nursing Ctrs.*, 581 U.S. at 251 (quoting *Concepcion*, 563 U.S. at 339). It "require[s] a procedure that is inconsistent with the FAA," and in doing so, frustrates the FAA's "principal purpose" of "ensur[ing] that private arbitration agreements are enforced according to their terms." *Concepcion*, 563 U.S. at 344, 351 (citation omitted). *Santiago*'s holding, to the extent it would invalidate any arbitration agreement entered by a parent for their minor child's benefit, is preempted by the FAA. M.B. may be bound by the RTOU's and MSA's arbitration clauses as a third-party beneficiary of the agreements M.B.'s Responsible Adult formed with Roblox and Microsoft.

## V.    Motion to Stay

Section 3 of the FAA requires a district court to stay litigation if the action involves an issue referable to arbitration. *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."). The only claims at issue are those that M.B. agreed to arbitrate, so the Court must stay the proceedings pending arbitration.

## VI.    Conclusion

For the foregoing reasons, the Court grants Defendants' Motions to Compel Arbitration. This matter is stayed pending the resolution of arbitration.